## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI, FLORIDA

| | |
|---|---|
| **CESAR MARTINEZ MONCADA,** Individually and on behalf of all others similarly situated<br><br>Plaintiffs-Petitioners,<br><br>vs.<br><br>**KRISTI NOEM**, Secretary, U.S. Department of Homeland Security (DHS); **PAMELA BONDI,** Attorney General of the United States; **DAREN K. MARGOLIN**, Director of the Executive Office for Immigration Review (EOIR); **TODD M. LYONS**, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement (ICE); **CHARLES WALL**, Deputy Director of the U.S. Immigration and Customs Enforcement (ICE),<br><br>Defendants. | CASE NO.<br><br><br>**CLASS ACTION APA JUDICIAL REVIEW AND DECLARATORY RELIEF** |

1

**INTRODUCTION**

1. This action challenges the government's final rule ("Rule") and associated policies that implement the safe third country provision in the asylum statute. That statutory provision allows the government to enter into international agreements for the purpose of removing asylum seekers from the United States to third countries that can hear their asylum claims.

2. Congress allowed these removals to third countries that are safe and provide for a full and fair asylum process, such that people will have a meaningful opportunity to pursue asylum free of persecution or torture in the proposed third country. 8 U.S.C. § 1158(a)(2)(A). The Department of Homeland Security (DHS) and the Department of Justice (DOJ) call these third country agreements "asylum cooperative agreements" ("ACAs").

3. Prior to 2019, the U.S. had only one third country asylum agreement, with Canada. During the First Trump administration, after the Rule was issued in November 2019, ACAs were initiated with Guatemala, Honduras, and El Salvador, all of which were refugee-producing countries plagued with acute levels of violence and with dysfunctional asylum systems. In February of 2021, the Biden administration terminated the aforementioned ACAs; however, the Rule was not rescinded.

4. During its second stint, the Trump administration is now using the Rule and the related agency actions challenged here to deny asylum seekers' protection applications and deport them to nations that the U.S. Department of States has reported to be unsafe, present serious human rights concerns, and/or weak or

corrupt asylum systems. These countries include Guatemala, Honduras, Paraguay, Uganda, Ecuador, and Belize.

5. The Rule violates the safe third country provision of the asylum statute and other immigration statutes, is arbitrary and capricious, and was issued in violation of the procedural requirements of the Administrative Procedure Act ("APA"). DHS and DOJ's guidance documents ("Guidance") issued to implement the Rule and the ACAs are likewise unlawful. DHS and DOJ's designations that these ACA countries have "full and fair" asylum systems ("Designations") are contrary to law and arbitrary and capricious.

**PARTIES**

1. Plaintiff, Cesar Augusto Martinez Moncada, is a Nicaraguan national and father of a U.S. citizen child, who has resided in the United States continuously since November 2021. Plaintiff is currently detained at the Krome Detention Center in Miami, Florida, under threat of removal based on an expedited removal order that was issued in violation of federal law.

2. Plaintiff fled from Nicaragua due to fear of persecution and torture by the Ortega regime. Petitioner successfully met the burden of proof establishing a credible fear of returning to Nicaragua. After being referred to removal proceedings to have his claim for asylum in front of an Immigration Judge, his case was pretermitted and an order of removal to Ecuador was entered without having his application for asylum heard.

3. Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity. The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum, withholding of removal, and CAT protection. Defendant Bondi has issued the new DOJ Designations in connection with ACAs signed by the current administration.

4. Defendant Daren K. Margolin is the Director of the Executive Officer for Immigration Review (EOIR). He is sued in his official capacity.

5. Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity. Defendant Noem oversees each of the component agencies of DHS. In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum and other immigration benefits. Defendant Noem has issued the new DHS Designations in connection with ACAs signed by the current administration.

6. Defendant Todd M. Lyons is the Senior Official Performing the Duties of the Director of ICE. He is sued in his official capacity.

7. Defendant Charles Wall is the Deputy Director of U.S. Immigration and Customs Enforcement (ICE). He is the second-in-command, managing the day-to-day operations for the more than 27,400 employees. His role involves directing Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI) to enforce immigration laws, arrest noncitizens, and secure borders.

## JURISDICTION AND VENUE

8. This case arises under the APA, 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality Act (INA), 8 U.S.C. § 1101, *et seq.*, and its implementing regulations; and the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 10-277, 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and its implementing regulations.

9. This Court has jurisdiction pursuant to the federal question jurisdiction, 28 U.S.C. §1331, in combination with the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* *See Califano v. Sanders*, 430 U.S. 99 105-107 (1977); *see also Mejia Rodriguez v. United States Dep't of Homeland Sec.*, 562 F.3d 1137, 1142-44 (11th Cir. 2009).

10. Venue properly lies in the Southern District of Florida pursuant to 28 U.S.C. § 1391(e)(1) in that this is an action against U.S. officers in their official capacity brought in the district where a substantial part of the event and/or omissions giving rise to Plaintiff's claims have occurred, and where Plaintiff resides as no real property is involved in this action. 28 U.S.C. §§ 1391(e)(1)(B).

## CLASS ACTION ALLEGATIONS

11. Plaintiff Cesar Martinez Moncada brings this action under Fed. R. Civ. P. 23(a) and 23(b) on behalf of themselves and a class of all other persons similarly situated.

12. Plaintiff seeks to present the following Proposed Class: All noncitizens who sought or will seek asylum, withholding of removal, or CAT after November 19, 2019, and whom Defendants have sought or will seek to bar from asylum, withholding of removal, or CAT protection in removal proceedings under 8 U.S.C. § 1229a on the

basis that they can be removed to a third country under an Asylum Cooperative Agreement pursuant to the Rule, Guidance, or Designations.

13. The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. On information and belief, Defendants have sought to pretermit the protection applications of at least hundreds of asylum seekers in multiple immigration courts across the country based on the Rule, Guidance, and Designations.

14. The class meets the commonality requirements of Rule 23(a)(2) because the members of the class are subject to a common practice: invocation of the Rule, Guidance, and Designations as a basis to bar them from seeking asylum, withholding of removal, and CAT protection. The suit also raises questions of law common to members of the proposed class, including violations to the asylum statute and violations to the APA.

15. The Proposed class meets the typicality requirements of Rule 23(a)(3). The claims of the representative Plaintiff are typical of the claims of the proposed class. Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (bar of their claims for asylum, withholding of removal, and CAT protection), based on the same government practice (the Rule, Guidance, and Designations)

16. Plaintiff satisfies the adequacy requirement of Rule 23(a)(4). Plaintiff will fairly and adequately protect the interests of the class. Plaintiff's interests are aligned with those of the proposed class because all class members seek the same relief: the ability to pursue their applications for asylum, withholding of removal, and protection

6

under the Convention Against Torture without being barred by Defendants' invocation of the Rule, Guidance, and Designations. Plaintiff has no interests antagonistic to those of the class and seeks the same declaratory and injunctive relief on behalf of all class members.

## FACTS AND PROCEDURAL HISTORY

17. Upon his apprehension by immigration authorities in 2021, Petitioner expressed a fear of persecution if returned to Nicaragua. However, the Department of Homeland Security (DHS) failed to provide the mandatory credible fear interview required by 8 U.S.C. § 1225(b)(1)(A)(ii) and 8 C.F.R. §§ 208.30, 235.3(b)(4). Instead, DHS issued a Form I-860 expedited removal order and subsequently released Petitioner, who has since filed a timely asylum application, obtained work authorization, and remained in full compliance with all U.S. immigration procedures.

18. On June 17, 2025, nearly four years after the original violation, Petitioner was arrested by ICE and renewed their intent to proceed with the order of expedited removal. This time around, however, DHS evaluated Plaintiff's claims of fear of persecution in Nicaragua.

19. On August 7, 2025, an asylum officer from U.S. Citizenship and Immigration Services (USCIS) conducted a credible fear interview to determine whether Plaintiff's claims of fear should be referred to an Immigration Judge for proceedings under 8 U.S.C. § 1229. The asylum officer found that the Plaintiff met his burden of proof and referred him to removal proceedings for a complete evaluation of his asylum application.

7

20. On December 11, 2025, DHS filed a motion to pretermit Plaintiff's application for asylum, statutory withholding and CAT protection. DHS claimed that Ecuador applied as an ACA for Plaintiff in this case.

21. The Motion to pretermit was granted on December 17, 2025, finding that Plaintiff in this case did not meet his burden that he will more likely than not be tortured or persecuted in Ecuador, and ordering him removed from the United States to Ecuador.

22. The ACA presumes a functioning asylum and protection system in the partner country. Ecuador's institutional deficiencies, including delays, lack of access to services, corruption, and lack of resources, create a substantial risk of severe harm upon arrival.

## LEGAL BACKGROUND

23. Asylum affords protection to individuals who have suffered persecution or have a "well-founded fear" of persecution on account of race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A). The Supreme Court has recognized that even a ten percent chance of persecution can give rise to a well-founded fear of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987). Past persecution gives rise to a presumption of a well-founded fear of future persecution and thus of asylum eligibility.

24. Subject to several narrow exceptions, including the safe third country exception at issue here, Congress has mandated that "[a]ny [noncitizen] who is physically

present in the United States or who arrives in the United States . . . , irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

25. There are three principal ways to seek asylum. First, a noncitizen not in removal proceedings may file an "affirmative" application with USCIS and complete an interview with an asylum officer. 8 C.F.R. §§ 208.2(a), 208.9. Second, a noncitizen in Section 240 removal proceedings in immigration court under 8 U.S.C. § 1229a may submit a "defensive" asylum application to the immigration judge as a form of relief from removal. 8 C.F.R. § 1208.2(b). Third, a noncitizen who has been placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) may raise an asylum claim by expressing fear of removal and undergoing a credible fear interview with an asylum officer to screen for asylum eligibility. 8 U.S.C. § 1225(b)(1).

26. The withholding provision, 8 U.S.C. § 1231(b)(3), bars the government from "remov[ing] [a noncitizen] to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of . . . race, religion, nationality, membership in a particular social group, or political opinion." The withholding statute bars removal to any country where a noncitizen can show they would more likely than not be persecuted, not just the noncitizen's country of nationality. As with asylum, a showing of past persecution creates presumptive eligibility for relief.

27. Regulations implementing the CAT likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 1208.16(c)(2).

28. The withholding of removal statute and the CAT regulations implement international treaty obligations not to send noncitizens to countries where they face persecution or torture, known as non-refoulement obligations. The Supreme Court has held that the withholding statute addresses the requirement in Article 33 of the 1951 United Nations Refugee Convention, incorporated into its 1967 Protocol to which the United States is a signatory, that no signatory "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).

29. The CAT regulations address the requirement in Article 3 of the CAT that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." These prohibitions on refoulement encompass both direct refoulement—sending asylum seekers directly to countries where they face persecution or torture; and indirect refoulement—sending asylum seekers to countries that then send them onward to persecution or torture.

30. An asylum officer cannot decide claims for withholding of removal and CAT protection. Only an immigration judge can make these ultimate determinations of whether a noncitizen's removal to a given country is prohibited by our non-refoulement obligations.

31. Noncitizens subjected to expedited removal proceedings who do not fear removal can be ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). But Congress crafted an exception for individuals who express fear of removal. To determine if that exception applies, immigration officers must affirmatively ask noncitizens whether they have "any fear or concern about being returned to [their] home country or being removed from the United States." DHS Form I-867AB; 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to use Form I-867AB). A noncitizen who expresses such a fear is entitled to a credible fear interview. 8 U.S.C. § 1225(b)(1)(B).

32. At the credible fear interview, the asylum officer must affirmatively "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d)

33. Because the credible fear interview is a threshold screening device, noncitizens need not satisfy the ultimate standards for asylum, withholding of removal, or CAT protection. Instead, they need only show a "significant possibility" that they could establish eligibility in a full removal hearing. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3).

34. Congress created a low threshold at the credible fear stage to ensure that potentially valid protection claims could be developed properly before an immigration judge, so that bona fide asylum seekers would not be summarily removed. Congress intended the expedited removal statute to balance efficiency with a "second, equally important goal: ensuring that individuals with valid asylum claims are not returned

11

to countries where they could face persecution." *Grace v. Barr*, 965 F. 3d 883, 890 (D.C. Cir. 2020).

35. Congress created the safe third country provision at 8 U.S.C. § 1158(a)(2)(A) as one of three narrow exceptions to the right to seek asylum. Under this act, an individual may not apply for asylum "if the Attorney General determines that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the [noncitizen]'s nationality or, in the case of a [noncitizen] having no nationality, the country of the [noncitizen]'s last habitual residence) in which the [noncitizen]'s life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States."

36. The United States first signed the safe third country agreement with Canada on December 5, 2002. In its present form, that agreement provides that an asylum seeker who presents at or crosses the U.S.-Canada border may be removed back to the other country to apply for asylum. The agreement first entered into force on December 29, 2004.

37. For more than sixteen years after signing the agreement with Canada, the United States did not enter into any other safe third country agreement. However, in 2019 the U.S. government signed three agreements that it referred to as ACAs with

12

Guatemala, El Salvador, and Honduras in order to remove asylum seekers to those countries pursuant to the safe third country provision.

38. Unlike Canada, which is a stable democracy that accepts large numbers of asylum seekers and has low levels of violence, Guatemala, El Salvador, and Honduras in 2019 all had epidemic levels of violence, produced large numbers of asylum seekers, and lacked functional asylum systems.

39. Since June 2025, the United States government has signed a series of new ACAs with countries that the State Department itself has acknowledged are unsafe, commit serious human rights violations, and/or have weak or corrupt asylum systems.

40. On information and belief, Defendants have issued Designations categorically finding that each country with which the United States has signed an ACA has a "full and fair" asylum process. Defendants have not published any of the Designations. Plaintiffs challenge all Designations that have been issued concerning any country—whether or not an ACA with that country has been made public and therefore including but not limited to the ACA countries identified herein.

41. On November 19, 2019, former Attorney General Barr and former purported Acting DHS Secretary Wolf promulgated the Rule challenged here. 84 Fed. Reg. 63,994. The Rule creates a framework for removals under so-called ACAs—excluding the Canada agreement, which remains governed by separate regulations—by instituting new procedures that apply to noncitizens in Section 240 proceedings and expedited removal proceedings.

13

42. Defendants issued the Rule without following the APA requirements of notice and comment rulemaking followed by a 30-day implementation period. *See* 5 U.S.C. § 553(b)(B), (d). Instead, they asserted the good cause and foreign affairs exceptions to these requirements. *See id*. § 553(a)(1), (b)(B), (d)(3).

43. Under the Rule, an asylum applicant who is subject to an ACA can generally avoid removal only by showing that it is more likely than not that they will be persecuted in the proposed ACA country of removal. However, in both expedited removal proceedings and Section 240 removal proceedings, the Rule and Guidance do not adequately ensure that asylum seekers will have the opportunity to express fears of removal to ACA countries or that they will have the opportunity to make the required showings of likelihood of persecution or torture.

44. When used in expedited removal, the process of requiring noncitizens to demonstrate their ultimate eligibility for withholding of removal or CAT protection to third countries during initial interviews strips away essential procedural safeguards that Congress created to protect asylum seekers from refoulement to countries where they may be persecuted or tortured.

45. First, if the government deems an asylum seeker in expedited removal proceedings potentially removable under an ACA, the asylum seeker is diverted away from the normal credible fear process into a new process created by the Rule. Instead of receiving a credible fear interview, in which asylum officers must affirmatively ask noncitizens whether they fear harm in the receiving country, the Rule provides that the asylum seeker "shall be provided written notice that if he or she fears removal to

14

the prospective receiving country because of the likelihood of persecution on account of a protected ground or torture in that country . . . the [noncitizen] should affirmatively state to the officer such a fear of removal." 84 Fed. Reg. at 64,009. The Rule does not explain when such notice will be provided, who shall provide it, whether it must be in the noncitizen's language, or how notice is to be given if the noncitizen is illiterate.

46. Second, if the noncitizen does express such a fear, an asylum officer will assess their risk of persecution or torture in the ACA country in what the Rule calls a "threshold screening interview." 84 Fed. Reg. at 64,008-64,009.

47. In that interview, the Rule provides that the officer will "determine whether it is more likely than not that the [noncitizen] would be persecuted on account of a protected ground or tortured in that country," 84 Fed. Reg. at 64,009—which is the ultimate standard for receiving withholding or CAT relief in a full removal hearing before an immigration judge, not the lower screening standard used in credible fear or reasonable fear interviews, in which noncitizens must show only a possibility of ultimately establishing eligibility after a full hearing. Only if the noncitizen meets that ultimate standard as to every ACA country to which they are susceptible to removal, *see Id.*, will the noncitizen then receive a normal credible fear interview regarding their fear of removal to their home country.

48. It is often impossible for asylum seekers to make this showing while detained and within days of being placed into an expedited removal process. An asylum seeker who may have spent little or no time in the third country would have to explain

15

why they feared being returned there. Doing so might require substantial country conditions evidence, an explanation of the relationship between that country and the applicant's country of origin, or details as to why the same form of harm that the person fled in their home country is likely in the third country as well.

49. Thus, noncitizens subject to an ACA would only receive a credible fear interview—and have the chance of developing and presenting her asylum, withholding of removal, and CAT claims in immigration court—if they both affirmatively express a fear of removal to the ACA country and manage to satisfy the ultimate standard for withholding of removal or CAT protection by showing that they are more likely than not to be persecuted or tortured in the ACA country.

50. Unlike in credible fear interviews, the noncitizen subjected to an ACA interview must make this much greater evidentiary showing without any opportunity to consult with or be represented by counsel.

51. If, the asylum officer determines that the noncitizen does not meet the ultimate more-likely-than-not standard, the noncitizen cannot apply for asylum, withholding of removal, or CAT protection in the United States, and is subject to immediate removal to the ACA country once a supervisory asylum officer signs off on the decision.

52. That asylum officer's determination that a noncitizen is barred from applying for asylum and may be removed to the ACA country under an ACA is final, because the Rule also forbids immigration judge review.

53. The Rule also provides for its application in Section 240 removal proceedings in immigration court by immigration judges and DHS attorneys. The Rule amended DOJ regulations governing Section 240 removal proceedings by authorizing immigration judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT claims as to their countries of origin.

54. The Rule also prohibits immigration judges from exercising the broad "public interest" exception conferred on immigration judges by the safe third country provision. *See* 8 U.S.C. § 1158(a)(2)(A). The Rule instead provides that only DHS may exercise that discretionary authority.

55. In both expedited and Section 240 removal proceedings, often the only way for a noncitizen subject to an ACA to avoid removal to the ACA country is to abandon their asylum claim and accept a removal order to their country of origin—which, of course, is the country from which they are seeking asylum in the first place.

56. On November 19, 2019, the same day the Rule was published in the Federal Register, Defendant USCIS distributed written guidance for asylum officers on conducting ACA threshold screening interviews in expedited removal proceedings.

57. That 2019 USCIS guidance provided that CBP officers were to make the initial determination as to whether a noncitizen falls under an ACA.

58. The 2019 USCIS guidance also provided that in these ACA interviews—unlike in credible fear interviews or in withholding of removal adjudications in Section 240 removal proceedings—demonstrating past persecution in their country does not

17

create a presumption of future persecution. Instead, such a showing would just count as "strong evidence" of the likelihood of future persecution. Under the 2019 USCIS guidance, the asylum officer was not permitted to determine that a noncitizen is more likely than not to face persecution based solely on past persecution.

59. Also on November 19, 2019, Defendant EOIR distributed guidance to immigration judges titled "Guidelines Regarding New Regulations Providing For Implementation Of Asylum Cooperative Agreements." That guidance stated in part that a noncitizen subject to an ACA is not eligible for asylum, withholding of removal, or CAT protection "unless the immigration judge determines" that the ACA "does not preclude the [noncitizen] from applying for asylum in the United States," that the noncitizen "qualifies for an exception to the relevant" ACA; or that the noncitizen "has demonstrated that it is more likely than not that he or she would be persecuted on account of a protected ground or tortured in the third country."

60. The 2019 EOIR guidance further stated that "[i]mmigration judges should not review, consider, or decide any issues pertaining to any discretionary determination on whether [a noncitizen] who is subject to an ACA should be permitted to pursue asylum in the United States"; and that a noncitizen "who is otherwise barred from applying for asylum pursuant to an ACA may nonetheless file an asylum application with the immigration court if DHS files a written notice stating that DHS has decided in the public interest that the [noncitizen] may pursue an application for asylum or withholding of removal in the United States."

61. On November 20, 2019, Defendants began applying the Rule and the 2019 Guatemala ACA to asylum seekers in expedited removal proceedings.

62. When those removals began, the U.S. and Guatemalan governments had not yet developed any plan to ensure that asylum seekers deported under the agreement would be able to access asylum procedures.

63. Non-Guatemalan nationals who were removed to Guatemala pursuant to the Rule and the 2019 Guatemala ACA were given preliminary authorization to stay in the country for just 72 hours. Within those 72 hours, they had to decide whether to return to their countries of origin or remain in Guatemala and attempt to apply for asylum there. However, many people had not received adequate information or instructions about the process of applying for asylum in Guatemala to allow them to make an informed decision just days after their disorienting deportation to an unexpected country.

64. Those removed to Guatemala also faced significant pressure to return to their countries of origin. The United States provided substantial funds to support efforts in Guatemala to offer the removed noncitizens transportation back to their countries of origin, which intensified the pressure for them to do so. And the shelter infrastructure in Guatemala that existed for people removed under the Rule authorized only very brief stays.

65. Moreover, Guatemala did not provide access to guidance or support for the legal and social service needs that would be necessary if individuals actually wanted to remain in the country and seek protection.

19

66. On February 2, 2021, former President Biden directed the Attorney General and DHS Secretary to "promptly review and determine whether to rescind the interim final rule" at issue in this case "as well as any agency memoranda or guidance issued in reliance on that rule." Executive Order 14010, 86 Fed. Reg. 8267, 8270. That executive order further directed the Secretary of State to "promptly consider whether to notify the governments of" Guatemala, Honduras, and El Salvador that "the United States intends to suspend and terminate" the 2019 ACAs with those countries. *Id*. All three 2019 agreements terminated by August 2021.

67. However, the government has not announced publicly or represented in this litigation that it has rescinded the 2019 Designations concerning Honduras, Guatemala, and El Salvador or that it has rescinded the 2019 agency guidance documents.

68. Since June 2025, the United States government has signed a series of new ACAs with countries that the State Department itself has acknowledged are unsafe, commit serious human rights violations, and/or have weak or corrupt asylum systems. On information and belief, Defendants are actively working to sign further ACAs with inappropriate third countries. ACAs signed by the current administration to date include the following.

69. On June 13, 2025, the United States signed a new ACA with Guatemala, which was published on July 15, 2025. 90 Fed. Reg. 31670. The agreement provides for the "transfer of nationals of Central American countries to Guatemala" and does not set forth any limitation on the number of non-Guatemalan nationals who can be

removed to Guatemala pursuant to the agreement. *Id.* at 31675. Nevertheless, the State Department still warns that people should reconsider travel to Guatemala due to crime.

70. The United States completed an ACA with Ecuador on July 23, 2025, and that agreement was published on November 17, 2025. 90 Fed. Reg. 51376.

71. Ecuador has suffered from an explosion of violence by warring drug cartels in recent years. The State Department reports that in January 2024, the country's president "decreed a state of emergency" due to "escalating violence from local and transnational organized crime groups." U.S. Dep't of State, *2024 Country Reports on Human Rights Practices: Ecuador* (2025), https://perma.cc/J9E2-WFEY.

72. Yet the State Department reports that violence and kidnappings "by criminal groups increased" last year, alongside arbitrary arrests, killings, and "serious restrictions on freedom of expression" by the government. *Id*. The State Department cautions that travel to Ecuador is dangerous because "[v]iolent crime, such as murder, assault, kidnapping, and armed robbery, is prevalent and widespread." U.S. Dep't of State, *Ecuador Travel Advisory*, Apr. 15, 2024, https://perma.cc/6ZAY-2P5N.

73. On August 28, 2025, just one week before the Secretary of State met with officials in Ecuador to discuss finalizing an ACA, the State Department's Overseas Security Advisory Council reported that "[d]espite an increased outcry from the Ecuadorean population and authorities' focus on curbing crime, Ecuador continues to experience high rates of mass shootings, bombings, extortion, and kidnapping." U.S. State Dep't

21

Overseas Security Advisory Council, *Violent Crime Surge in Ecuador*, Aug. 28, 2025, https://www.osac.gov/.

74. Since at least July 2025, ICE attorneys have been making oral and/or written motions in immigration courts asking immigration judges to pretermit noncitizens' applications for asylum, withholding of removal, and CAT protection and order the noncitizens removed to countries with which ACAs have been signed. In these motions, ICE attorneys argue that noncitizens need not be given any opportunity to express fear of removal to the ACA country, even though the possibility of removal to that third country is being raised for the first time—often in open court at the time of the removal hearing.

75. In recent months, Defendants have aggressively expanded this practice to immigration courts across the United States and have made at least hundreds of ACA pretermission motions.

76. On information and belief, the Guidance directs ICE attorneys to make ACA pretermission motions in broad categories of cases involving applications for asylum, withholding of removal, and/or CAT protection. On information and belief, this includes directives that ICE attorneys bring those motions in virtually all such cases, seeking the removal of many more noncitizens with protection claims to ACA countries than those countries could reasonably be expected to receive—even assuming that the countries were actually safe and had full and fair asylum procedures.

77. Defendants are also attempting to coerce noncitizens into withdrawing their applications for protection and accept removal to their countries of origin in order to avoid removal to the ACA third countries. On information and belief, these actions are also undertaken pursuant to the Guidance.

78. On information and belief, the Guidance authorizes and/or directs immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection as to the original proposed country of removal without permitting the noncitizen to seek withholding of removal or CAT protection with respect to the ACA country.

79. On information and belief, the Guidance also authorizes and/or directs immigration judges to sua sponte order pretermission of applications for asylum, withholding of removal, and CAT protection and to order removal to third countries pursuant to ACAs, as happened to Plaintiff Y.A.

80. On information and belief, the Guidance authorizes and/or directs Defendants to foreclose noncitizens from the opportunity to seek withholding of removal and CAT protection either to the applicants' home country or to the proposed ACA country or countries of removal, even though the asylum statute's safe third country provision does not provide an exception from withholding of removal or CAT protection.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Challenge to the Designations)**

23

**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A), and the APA, 5 U.S.C. § 706(2)(A))**

81. The asylum statute's safe third country provision requires that before the government may remove an asylum seeker to a "safe third country" pursuant to an international agreement, it must first determine that the third country is "safe" and would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A).

82. The statute therefore requires Defendants to assess not just whether potential receiving countries have adopted laws, regulations, and policies providing for asylum or equivalent protection but whether receiving countries, in reality, are safe and have procedures and operations in place to effectively provide for asylum or equivalent protection, as well as the actual number of asylum seekers to whom the countries could realistically provide such truly full and fair procedures.

83. The Designations fail to account for whether those countries are, in reality, safe and capable of providing full and fair access to protection or the actual number of people to whom the countries could realistically provide such full and fair procedures.

84. The Designations therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**(Challenge to the Rule and Guidance)**

**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**

**and the APA, 5 U.S.C. § 706(2)(A))**

85. The asylum statute's safe third country provision prohibits the government from removing an asylum seeker to a third country pursuant to a bilateral or multilateral agreement unless it first "determines that . . . the [noncitizen]'s life or freedom would not be threatened on account of" a protected ground in the third country. 8 U.S.C. § 1158(a)(2)(A). It thus requires that the government make a likelihood-of-persecution determination in every case prior to removing an asylum seeker under such an agreement.

86. In expedited removal proceedings, the Rule and Guidance do not provide for such a determination in every case. Instead, they require a likelihood-of-persecution assessment only if the individual affirmatively informs an asylum officer that they have a fear of removal to the relevant third country.

87. In Section 240 removal proceedings, the Rule and Guidance likewise do not ensure the required determination in every case. They instead direct ICE attorneys to seek pretermission and allow immigration judges to pretermit applications for asylum, withholding of removal, and CAT protection and order noncitizens removed to ACA countries without ensuring that noncitizens have adequate notice and the opportunity to raise fears as to any proposed ACA country of removal and have hearings to determine whether they may be persecuted in the proposed countries. 166. The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

**(Challenge to the Rule and Guidance)**

**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**

**and the APA, 5 U.S.C. § 706(2)(A))**

88. The safe third country provision also requires that before the government may remove an asylum seeker to a "safe third country" pursuant to a bilateral agreement, it must first determine that the third country would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A).

89. The statute therefore requires Defendants to assess whether the proposed country of removal is in fact able to provide a full and fair asylum process to particular asylum applicants based on their specific characteristics.

90. The Rule and Guidance instead provide that Designations concerning this statutory requirement will be made strictly on a categorical basis. The Rule and Guidance do not provide for asylum officers or immigration judges to consider whether any individual asylum seeker would lack access to a full and fair asylum process in an ACA country, even if the individual has specific grounds to believe that they, in particular, would not have access to a full or fair process in that country.

91. The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**

**(Challenge to the Rule and Guidance)**

**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**

26

**and the APA, 5 U.S.C. § 706(2)(A))**

92. The safe third country provision contains an exception applicable if "the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States." 8 U.S.C. § 1158(a)(2)(A). With respect to Section 240 removal proceedings in immigration court, the term "the Attorney General" as used in the statute encompasses DOJ immigration judges.

93. The Rule and Guidance erroneously provide that immigration judges lack this authority and that only DHS can make the public interest determination.

94. The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**FIFTH CLAIM FOR RELIEF**

**(Challenge to the Rule and Guidance)**

**(Violation of 8 U.S.C. § 1231(b)(3), and its implementing regulations; FARRA, codified at 8 U.S.C. § 1231 note, and its implementing regulations; and the APA, 5 U.S.C. § 706(2)(A))**

95. The INA's withholding of removal provision, 8 U.S.C. § 1231(b)(3), and Section 2242(a) of FARRA implement the United States' non-refoulement treaty obligations with respect to persecution and torture.

96. The withholding of removal provision bars removal of a noncitizen to a country where it is more likely than not that they would face persecution. 8 U.S.C. § 1231(b)(3).

27

97.  FARRA bars removal of a noncitizen to a country where it is more likely than not that they would be tortured. 8 U.S.C. § 1231 note; see 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2).

98. Longstanding regulations implement these statutory provisions and the obligation not to remove an individual to persecution or torture. For instance, the determination whether an individual faces a risk of persecution or torture and is entitled to withholding of removal or CAT protection can be made only by an immigration judge, and only after full removal proceedings in immigration court. 8 C.F.R. § 208.16(a), (c)(4); id. § 1208.16(a), (c)(4). And past persecution creates a rebuttable presumption of eligibility for withholding of removal. See 8 C.F.R. §§ 208.16(b)(1)(i), 1208.16(b)(1)(i). 178. The Rule and Guidance are inconsistent with, and seek to bypass, these statutory and regulatory requirements.

99. In expedited removal proceedings, the Rule and Guidance require asylum officers, not immigration judges, to make the ultimate withholding and CAT determinations and deny the opportunity for immigration judge review.

100.   In Section 240 removal proceedings, the Rule and Guidance allow immigration judges to pretermit applications for withholding of removal and CAT protection as to the originally proposed countries of removal and then to order removal to third countries, without ensuring that noncitizens have the opportunity to raise fears of persecution or torture in those countries and receive hearings on withholding of removal and CAT protection.

101. The Guidance also provides that, in determining whether an individual is more likely than not to be persecuted in the receiving country, past persecution shall not establish a presumption of future persecution.

102. Because the Rule and Guidance abandon the statutory and regulatory safeguards designed to ensure these critical protections against nonrefoulement to persecution and torture, the Rule and Guidance violate 8 U.S.C. § 1231(b)(3) and FARRA, and their implementing regulations, and are therefore contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## SIXTH CLAIM FOR RELIEF

**(By Section 240 Individual Plaintiffs and Proposed Class Only)**

**(Challenge to the Rule and Guidance)**

**(Violation of the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1229a, 8 C.F.R. Part 1240, and the APA, 5 U.S.C. § 706(2)(A)-(B))**

103. The Rule and Guidance fail to ensure adequate notice and opportunity to be heard prior to the denial of applications for asylum, withholding of removal, and CAT protection.

104. The Rule and Guidance therefore violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution and statutory and regulatory due process protections in 8 U.S.C. § 1229a and 8 C.F.R. Part 1240.

## SEVENTH CLAIM FOR RELIEF

**(Challenge to the Rule and Guidance)**

**(Violation of the Credible Fear Statute, 8 U.S.C. § 1225(b)(1))**

29

105.    Under the INA, a noncitizen placed in expedited removal proceedings must be asked if they fear removal or wish to seek asylum and if the noncitizen answers affirmatively, they must be referred to an asylum officer for a credible fear interview applying the low "significant possibility" screening standard. 8 U.S.C. § 1225(b)(1).

106.    A noncitizen "who is eligible for such interview may consult with a person or persons of the [noncitizen]'s choosing prior to the interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that "person . . . may be present at the interview and may be permitted . . . to present a statement at the end of the interview," 8 C.F.R. § 208.30(d)(4).

107.    Following the credible fear interview, "if the officer determines that [a noncitizen] does not have a credible fear of persecution," the noncitizen is entitled to "request . . . prompt review by an immigration judge of [that] determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III).

108.    This credible fear interview process, with its attendant safeguards, is the only mechanism in expedited removal proceedings by which the government may remove an individual who has expressed a fear of persecution or intention to apply for asylum. Only removal proceedings "specified in" the INA may supplant Section 240 removal proceedings before an immigration judge. 8 U.S.C. § 1229a(a)(3). 189. If applied in expedited removal proceedings, the safe third country provision must be applied through the statutory credible fear interview process, with its attendant procedural safeguards. Nothing in the safe third country provision purports to create an alternate expedited removal mechanism.

109.    Because the Rule and Guidance provide for the expedited removal of asylum seekers without application of the low credible fear screening standard, right to consultation with and representation by counsel, and immigration judge review, the Rule and Guidance violate 8 U.S.C. § 1225(b)(1) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

## EIGHTH CLAIM FOR RELIEF

### (Challenge to the Rule, Guidance, and Designations)

### (Violation of the APA, Arbitrary and Capricious)

110.    The APA requires reasoned and reasonable policy-making.

111.    The Rule, Guidance, and Designations are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

112.    Among other reasons, the Rule, Guidance, and Designations are arbitrary and capricious because Defendants adopted procedures unreasonably ill-suited to complying with their non-refoulement obligations; made unacknowledged, inadequately explained, and unjustified departures from prior agency policies and procedures; failed to articulate reasoned explanations for their decisions; considered factors that Congress did not intend to be considered; failed to consider and account for third countries' actual safety, third countries' actual ability to provide full and fair protection procedures, or the number of people to which third countries can actually provide such procedures; entirely failed to consider other important aspects of the problem; and offered explanations that run counter to the evidence before the agencies.

## NINTH CLAIM FOR RELIEF

### (Challenge to the Rule)

### (Violation of the APA, Notice And Comment and 30-Day Grace Period)

113.    The APA requires notice and opportunity for comment prior to the promulgation of regulations. 5 U.S.C. §§ 553(b), (c). Defendants failed to provide notice and an opportunity to comment prior to the Rule's effective date.

114.    The APA requires that a regulation be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendants failed to comply with this requirement with respect to the Rule.

115.    Defendants have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Individually and on behalf of all others similarly situated, respectfully prays that that this Honorable Court will:

1. An order certifying the proposed class, appointing the Section 240 Individual Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

2. A declaration pursuant to 28 U.S.C. § 2201 that the Rule, Guidance, and Designations are contrary to law, in excess of statutory authority, and/or arbitrary and capricious; Vacatur of the Rule, Guidance, and Designations;

32

3. An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Rule, Guidance, and Designations;

4. For any Section 240 Individual Plaintiff who is removed to a third country pursuant to the Rule, Guidance, or Designations, an order requiring Defendants to (1) physically return each removed Section 240 Individual Plaintiff to the United States and (2) parole each removed Section 240 Individual Plaintiff into the United States or otherwise permit them to apply for asylum, withholding of removal, and/or CAT protection;

5. An order awarding Plaintiffs' costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

6. Such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted,


s/Eduardo Soto                                                         March 12, 2026
Eduardo Soto, Esq.                                                          Date
Florida Bar No. 0858609
Eduardo Soto & Associates, P.A.
999 Ponce de Leon Blvd., Suite 1040
Coral Gables, Florida 33134
Office: (305) 446-8686
Fax: (305) 529-0445

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on March 12, 2026, I electronically filed the foregoing document with the Clerk of Court using PACER. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by PACER or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

<u>s/ Eduardo Soto</u>                                                          <u>March 12, 2026</u>
Eduardo Soto, Esq.                                                                   Date
Florida Bar No. 0858609
Eduardo Soto & Associates, P.A.
999 Ponce de Leon Blvd., Suite 1040
Coral Gables, Florida 33134
Office: (305) 446-8686
Fax: (305) 529-0445